**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SPOTLIGHT TICKET MANAGEMENT, INC., | Case No. 2:25cv00170 MCA (JSA) |
| *Plaintiff*, | **JURY TRIAL DEMANDED** |
| v. | |
| TICKETOS, TICKETOS TECHNOLOGY, INC., and NEXT SPORTS & ENTERTAINMENT, LLC, | |
| *Defendants*. | |

**SECOND AMENDED COMPLAINT**

Plaintiff Spotlight Ticket Management, Inc. ("Plaintiff" or "Spotlight"), by and through its undersigned attorneys, for its Second Amended Complaint[1] against defendants TicketOS, TicketOS Technology, Inc., and Next Sports & Entertainment, LLC (collectively, "Defendants" or "TicketOS"), alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

1. This is an action for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for substantial and related claims

---

[1] Plaintiff files its Second Amended Complaint pursuant to the Court's February 27, 2026 Order on Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Dkt No. 31).

of tortious interference with prospective economic advantage and contract under the common laws of the State of New Jersey, all arising from Defendants' false representations that their corporate ticket management service platform is integrated with Ticketmaster.

2. Plaintiff seeks injunctive and monetary relief.

## I. <u>INTRODUCTION</u>

3. This case arises from Defendants' willful false and misleading representations to the marketplace regarding their corporate ticket management service.

4. For years, Defendants have advertised and promoted their service as having integration with Ticketmaster for corporate ticket management despite knowing it did not.

5. Defendants were *expressly told* repeatedly by Ticketmaster that they lacked integration with Ticketmaster and that they could not obtain an integration because Ticketmaster granted Spotlight exclusivity in this space.

6. Undeterred, Defendants continued their rampant misinformation campaign offering their inferior service at a fraction of Spotlight's pricing, while misrepresenting that their service offers the same superior functionality as Spotlight's service.

7. In addition, Defendants have repeatedly misrepresented parity between their service and Spotlight's service despite clear knowledge to the contrary.

8. Defendants knew that Spotlight not only had an exclusive integration with Ticketmaster, but also a unique partnership with Ticketmaster giving it access to functionality not available on any other corporate ticket management service, including Defendants'.

9. Indeed, Defendants tried numerous times to obtain such functionality from Ticketmaster, but were rebuffed at each attempt.

10. Despite their failures, Defendants continued to market their service as being able to do everything Spotlight could do, despite knowing that was untrue.

11. Finally, Defendants not only made misrepresentations concerning integration with Ticketmaster and parity with Spotlight, they also falsely claimed to have security protocols that never existed, deceiving consumers as to the safety of their service.

## II.  PARTIES

12. Plaintiff Spotlight is a Delaware corporation with its principal place of business at 256635 West Agoura Road, Calabasas, California, 91302. Spotlight does business as "TicketManager."

13. TicketOS and TicketOS Technology, Inc. are Delaware corporations with a principal place of business at 16 Portland Place, Montclair, New Jersey 07042. Ari Strulson is the Chief Executive Officer of both entities.

14. Next Sports & Entertainment, LLC ("Next") is a limited liability corporation with abusiness address of 5 Chadwick Road, Livingston, New Jersey 07042, which is its principal place of business. Its sole member, Ari Strulson, is a resident of New Jersey. Mr. Strulson's residential address is the same as Next's business address.

15. On Defendants' website, the Terms of Service state that the TicketOS website is operated by Next Sports & Entertainment, LLC. **(Exhibit A)**

16. Similarly, the Privacy Policy on Defendants' website states that it governs visitors' "use of the various services offered by Next Sports & Entertainment, LLC." **(Exhibit B)**

17. Defendants' cookie policy on its website states that all questions or comments should be directed to Next Sports & Entertainment, LLC. **(Exhibit C)**

18. Next's website also advertises for TicketOS. It states that its "sister company, TicketOS, helps companies manage their sports, entertainment and sponsorship assets." **(Exhibit D)**

19. Plaintiff is informed and believes, and based thereon alleges, that at all times material hereto, each of the Defendants named herein was/were the ostensible agent, employee, alter ego and/or joint venture of, or working in concert with each of the other co-Defendants and was acting within the course and scope of such agency, employment, joint venture, or concerted activity. To the extent said acts, conduct, and omissions were perpetrated by certain Defendants, each of the remaining Defendants confirmed and ratified said acts, conduct, and omissions of the acting Defendant.

20. Upon information and belief, and based on the foregoing in paragraphs 15-19, it appears the corporate ticket management service offering under the brand TicketOS is offered by all the Defendants acting in unison. Therefore, the actions complained of herein and the causes of action apply equally to all Defendants.

## III. JURISDICTION AND VENUE

21. This court has jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1332(a), and 1338(a) and (b), and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

22. Plaintiff's claims for false advertising arise under the Trademark Act of 1946 (as amended), namely, 15 U.S.C. §§ 1051 *et seq*. Therefore, this

Court has subject matter jurisdiction over these claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a), respectively.

23. Plaintiff's claim for tortious interference arises under New Jersey common law, and is so related to the federal claims asserted in this case that it forms part of the same case or controversy. Therefore, this Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

24. This Court has personal jurisdiction over Defendants because Defendants' principal places of business are in the State of New Jersey, and on information and belief, Defendants have committed one or more tortious acts within the State of New Jersey (including within this judicial district), and Spotlight's claims arise out of these tortious acts.

25. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), in that Defendants reside in this District, and 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.   FACTUAL BACKGROUND

### A.   Spotlight's Business

26. Spotlight was founded in 2007 as a software startup to connect corporations and their customers with ticket and event management

solutions.

27. Since then, Spotlight has grown to managing and automating over 30 million invitations, registrations, and tickets annually.

28. Spotlight serves its clients by managing ticket inventories and events, providing the systems for ticket delivery and fulfillment, as well as the technology for mobile entry into events.

29. Spotlight also partners directly with professional and college sport teams, venues, and well-known third-party ticketing and event-management applications to give Spotlight's customers and partners both a platform and the resources necessary to manage, analyze, and resell tickets.

30. In addition to managing ticket inventories for companies, venues, and teams, Spotlight creates and manages loyalty programs that enable Spotlight's users to reward their own clients, prospects, and employees with live events.

31. Spotlight also manages analytical technology that provides its users with data reporting on factors such as who used tickets and why, which allows Spotlight's customers to reduce waste and drive greater and new return on investment.

B.    **Spotlight's Partnership with Ticketmaster**

32.   Ticketmaster Entertainment, LLC ("Ticketmaster") is a preeminent ticket sales and distribution company that sells tickets for live entertainment events to the public on behalf of its clients through its website, mobile app, and telephone call centers.

33.   In October 2016, Spotlight and Ticketmaster entered into a Registered Vendor and Affiliate Agreement (the "Agreement"), whereby Spotlight was granted the exclusive right to integrate its technology with Ticketmaster's software and systems platform for corporate ticket management and business events.

C.    **Integration Requires Permission and Cooperation Between Systems**

34.   Simply stated, "integration" in the context of computer systems is the "process by which disparate systems exchange data or coordinate actions to cooperate."

35.   This generally requires different systems and applications to talk directly to one another to exchange data or coordinate actions to cooperate and work together to accomplish some unitary function.

36.   To achieve that function, the systems must have permission to access and exchange data with each other.

37.   An integration may be achieved through the use of application

- 8 -

programming interfaces ("APIs") that enable one computer program to send data directly to, and receive data directly from, another computer program.

38. However, permission is a critical aspect of achieving an integration. In January/February 2026, well-known survey expert David Franklyn conducted a survey to test perceptions of the term "integration" specific to consumers of corporate ticket management services. Nearly 91% of respondents indicated that when hearing the term integration, they expect the service claiming the integration to have permission to access the other system.

39. Mr. Franklyn's survey results are consistent with sworn statements provided by several consumers of corporate ticket management services. *See Spotlight Ticket Management, Inc. v. Concierge Live LLC,* 2:24cv00859 (C.D. Cal.), Dkt. No. 176-5 at pp. 205-245 ("Customer Declarations").

40. Specifically, consumers expect a corporate ticket management provider to have permission to access the system with which it claims to be integrated.

**D.    Spotlight Achieved An Integration with Ticketmaster as the Result of Years of Mutual Development Efforts and Collaboration Between Spotlight and Ticketmaster**

41. Spotlight and Ticketmaster worked for years to co-develop the APIs used by Spotlight in connection with the integration, requiring extensive collaboration and redesigning of both the Spotlight and Ticketmaster systems.

42. Spotlight was involved in the initial design phase with Ticketmaster to develop the integration.

43. In addition, Spotlight's engineers regularly met with Ticketmaster's engineers to troubleshoot and add functionality to such integration.

44. Spotlight had to obtain permission not only from Ticketmaster, but from each individual team/venue that deploys the Ticketmaster software to access its servers.

45. Through their integration, Spotlight's system "talks" to the Ticketmaster system to access certain functionality that enables Spotlight customers to take specific actions related to their corporate ticket management services.

46. Exclusive to its integration with Ticketmaster, Spotlight enables companies to manage tickets directly with their team and venue providers with technology including the discovery of inventory,

transfer of mobile tickets, attendance scan information in real time, and rescinding of ticket transfers.

47. Spotlight is the only corporate ticket management service with the ability to offer real-time scan data and to rescind transfer of tickets.

48. Numerous consumers have attested that such exclusive features were essential to their decision in selecting a corporate ticket management service.  See Customer Declarations.

49. While that functionality is exclusive, Spotlight also holds the only integration with Ticketmaster in the business event and corporate ticket management category—that is, the ability to automatically and directly move Ticketmaster tickets without needing to go through the Ticketmaster website or a third party to do so.

50. Ticketmaster's Chief Strategy Officer and Senior Vice President of Product both provided sworn statements confirming that Spotlight is the only company in the corporate ticket management space that has an integration with Ticketmaster.  A copy of their sworn statements are attached hereto as **Exhibits E-F**.

51. Spotlight pays Ticketmaster a substantial fee each year in exchange for this exclusive integrated partnership, in addition to a percentage of annual revenue earned by Spotlight.

52. To date, Spotlight has paid millions of dollars for the right to be the exclusive corporate ticket management platform for Ticketmaster and the only company to be integrated with Ticketmaster's software and systems platform for that purpose.

53. Both Spotlight and Ticketmaster have publicized their exclusive integration partnership, and it is well known in the industry.

54. Spotlight's exclusive integration partnership with Ticketmaster provides Spotlight with a significant edge in relation to its competitors.

55. The Agreement and Spotlight's exclusive integration partnership with Ticketmaster remains in full force and effect today.

56. Ticketmaster has confirmed that Spotlight is the only company that has an integration with it in the business event and corporate ticket management category (to provide any functionality in this space).

**E.    TicketOS's Business**

57. TicketOS was founded in 2001,and was originally developed and owned by a company called RazorGator.

58. Around 2010, RazorGator ran into financial issues after it purchased too many tickets for the World Cup and Vancouver Olympics that cost the company $3.5 million dollars and resulted in it laying off about a quarter of its employees.

59. In 2018, and as RazorGator went bankrupt, TicketOS was acquired by Entertainment Benefits Group ("EBG").

60. Unable to invest and wanting to get the assets off the books, EBG sold TicketOS to Ari Strulson in early 2020. Mr. Strulson is the current Chief Executive Officer of TicketOS and TicketOS Technology, Inc. and is the sole member of Next Sports & Entertainment, LLC.

**F.    TicketOS's False and Deceptive Advertising**

61. Since at least 2019, Defendants have publicly and falsely represented and advertised through in person sales pitches and direct communications with potential clients, as well as through their public website, that TicketOS (i) has an integration with Ticketmaster, (ii) has the same functionality as Spotlight, and (iii) has "break glass" security capabilities (a method of bypassing security controls in the event of an emergency, referring to the idea of breaking a glass box to access a fire alarm or emergency lever) within its service.    None of these representations are true.

62. Upon information and belief, as discussed, *infra*, TicketOS does not have *any* integration with Ticketmaster as it relies upon a third party intermediary to interface with Ticketmaster, and that third party scrapes the Ticketmaster website.

63. Of course, scraping a website is not an integration, and doing so violates Ticketmaster's Terms of Use, negating any "permission" that allegedly existed.

64. Ticketmaster has confirmed in sworn statements that such scraping violates its Terms of Use. *See* **Exhibit F** (Volini Decl.).

65. As such, upon information and belief, by having a third party scrape Ticketmaster's website, TicketOS violated Ticketmaster's Terms of Use and negated any permissions required for an integration to exist.

66. Upon information and belief, TicketOS processes approximately 500,000 Ticketmaster tickets per year.

67. Upon information and belief, TicketOS causes a third party to scrape the Ticketmaster website to avoid paying mandatory transfer fees that Ticketmaster charges of 50 cents per ticket by using Ticketmaster's authorized tools for brokers. As such, upon information and belief, TicketOS is shorting Ticketmaster at least $250,000 per year in required fees.

68. Upon information and belief, even if TicketOS could somehow establish it had some form of integration with Ticketmaster, any alleged integration cannot do everything Spotlight's integration with Ticketmaster can do.

69. By way of example, TicketOS cannot offer real-time scan data or the ability to rescind ticket transfers through its corporate ticket management service.

70. Further, upon information and belief, TicketOS' service lacks the "break glass" security protocols it has advertised to consumers.

71. Upon information and belief, Defendants make sales pitches to prospective clients regarding their corporate ticket management services, during which they orally tout the benefits of TicketOS, including its purported integration with Ticketmaster.

72. Upon information and belief, Defendants have engaged in a campaign of disinformation, marketing their corporate ticket management services to numerous consumers through direct sales pitches where they misrepresent that they have an integration with Ticketmaster and that they can offer the same functionality as Spotlight at a lower price. Both representations are false.

73. The ticket management industry is a niche industry with only a handful of competitors.  Each of the ticket management industry players marketstheir services primarily to companies that buy a large number of tickets for various purposes in their businesses.

74. However, it should be noted that while such companies buy many

tickets, they are typically not sophisticated when it comes to corporate ticket management. In most cases, these customers seek to utilize a corporate ticket management service because they lack the resources and understanding of the process of handling large numbers of tickets. The customers rely on the corporate ticket management provider to seamlessly handle transfer of their tickets and ensure such tickets are readily usable by the multitude of potential recipients of such tickets.

75. It is standard practice to market ticket management services through direct sales pitches tailored to prospective clients.

76. Below are just a handful of examples of which Spotlight is aware where Defendants misrepresented the nature of their corporate ticket management service.

   *1.    TicketOS's Misrepresentations to Spotlight's Prospective Customer, A Global Financial Services Firm*

77. In July 2021, both Spotlight and TicketOS participated in an RFP to a global financial services firm.

78. In this RFP, TicketOS claimed that its system has certain capabilities that it does not have. TicketOS claimed that it implemented "break glass security," but it did not have this capability.

79. TicketOS also represented that its system had the same integration with Ticketmaster that Spotlight had, which was a material factor for the

global financial services firm.

80. As a result of TicketOS's misrepresentations, the global financial services firm awarded the contract to TicketOS over Spotlight.

*2.    TicketOS's Misrepresentations to Spotlight's Existing Customer, A Paper Products Manufacturer*

81. In June of 2022, Spotlight's customer, a paper products manufacturer, informed Spotlight that it would not renew its contract with Spotlight, and would be ending the contract at the end of the contract date of September 30, 2022.

82. On or about September 27, 2024, Spotlight learned from the paper products manufacturer's former Director of Corporate Marketing that he moved the business to TicketOS because TicketOS stated they had the same integration with Ticketmaster as Spotlight, but could provide the same services that Spotlight provided at a reduced cost.

83. As a result of TicketOS's misrepresentations, the paper products manufacturer moved its account from Spotlight to TicketOS.

*3.    TicketOS's Misrepresentations to Spotlight's Prospective Customer, A Global Financial Services Firm*

84. Upon information and belief, in Spring 2025, TicketOS presented a sales pitch to a global financial services firm.

85. Upon information and belief, in this sales pitch, TicketOS claimed that

its system has certain capabilities that it does not have. TicketOS claimed that its system was integrated with Ticketmaster, which was untrue.

86. Upon information and belief, TicketOS also represented that its system had the same functionality as Spotlight's system, which was a material factor for the global financial services firm.

87. As a result of TicketOS's misrepresentations, the global financial services firm awarded the contract to TicketOS.

4. *TicketOS's Misrepresentations to Spotlight's Prospective Customer, A Global Financial Services Firm*

88. Upon information and belief, in Spring 2025, TicketOS presented a sales pitch to a global financial services firm.

89. Upon information and belief, in this sales pitch, TicketOS claimed that its system has certain capabilities that it does not have. TicketOS claimed that its system was integrated with Ticketmaster, which was untrue.

90. Upon information and belief, TicketOS also represented that its system had the same functionality as Spotlight's system, which was a material factor for the global financial services firm.

91. As a result of TicketOS's misrepresentations, the global financial

services firm awarded the contract to TicketOS.

*5.    TicketOS's Misrepresentations to Spotlight's Prospective Customer, A Global Food Manufacturing and Services Firm*

92. Upon information and belief, in Spring 2025, TicketOS presented a sales pitch to a global food manufacturing and services firm.

93. Upon information and belief, in this sales pitch, TicketOS claimed that its system has certain capabilities that it does not have.  TicketOS claimed that its system was integrated with Ticketmaster, which was untrue.

94. Upon information and belief, TicketOS also represented that its system had the same functionality as Spotlight's system, which was a material factor for the global food manufacturing and services firm.

95. As a result of TicketOS's misrepresentations, the global food manufacturing and services firm awarded the contract to TicketOS.

*6.    TicketOS's Misrepresentations to Spotlight's Prospective Customer, A Global Communication Services Firm*

96. Upon information and belief, in Spring 2025, TicketOS presented a sales pitch to a global communication services firm.

97. Upon information and belief, in this sales pitch, TicketOS claimed that its system has certain capabilities that it does not have.  TicketOS

claimed that its system was integrated with Ticketmaster, which was untrue.

98. Upon information and belief, TicketOS also represented that its system had the same functionality as Spotlight's system, which was a material factor for the global communication services firm.

99. As a result of TicketOS's misrepresentations, the global communication services firm awarded the contract to TicketOS.

7.    *TicketOS's Misrepresentations to Spotlight's Prospective Customer, A Global Food Services Firm*

100. Upon information and belief, in late 2025, TicketOS presented a sales pitch to a global food services firm.

101. Upon information and belief, in this sales pitch, TicketOS claimed that its system has certain capabilities that it does not have.   TicketOS claimed that its system was integrated with Ticketmaster, which was untrue.

102. Upon information and belief, TicketOS also represented that its system had the same functionality as Spotlight's system, which was a material factor for the global food services firm.

103. As a result of TicketOS's misrepresentations, the global food services firm awarded the contract to TicketOS.

*8.     TicketOS's Misrepresentations to Spotlight's Prospective Customer, A Law Firm*

104. Upon information and belief, in early 2026, TicketOS presented a sales pitch to a law firm.

105. Upon information and belief, in this sales pitch, TicketOS claimed that its system has certain capabilities that it does not have.  TicketOS claimed that its system was integrated with Ticketmaster, which was untrue.

106. Upon information and belief, TicketOS also represented that its system had the same functionality as Spotlight's system, which was a material factor for the law firm.

107. As a result of TicketOS's misrepresentations, the law firm awarded the contract to TicketOS.

*9.     TicketOS's Misrepresentations to Spotlight's Prospective Customer, A Surgical Instrument Manufacturer Firm*

108. Upon information and belief, in late 2025, TicketOS presented a sales pitch to a surgical instrument manufacturer.

109. Upon information and belief, in this sales pitch, TicketOS claimed that its system has certain capabilities that it does not have.  TicketOS claimed that its system was integrated with Ticketmaster, which was

untrue.

110. Upon information and belief, TicketOS also represented that its system had the same functionality as Spotlight's system, which was a material factor for the surgical instrument manufacturer.

111. As a result of TicketOS's misrepresentations, the surgical instrument manufacturer awarded the contract to TicketOS.

*10.    TicketOS' Misrepresentations to a Healthcare Company in its Request for Proposal ("RFP")*

112. Upon information and belief, in April 2024, TicketOS submitted a RFP to healthcare provider Advent Health.

113. Among Advent Health's enumerated requirements for a corporate ticket management service was integration with Ticketmaster.

114. Upon information and belief, in submitting its RFP to Advent Health, TicketOS misrepresented that it had an integration with Ticketmaster.

115. Upon information and belief, as a result of those misrepresentations, TicketOS won the RFP and was awarded the contract by Advent Health.

116. Upon information and belief, the above examples were only a sample of the misrepresentations Defendants are making to the marketplace. Defendants have engaged in a campaign of misinformation misrepresenting both the nature of its alleged relationship with

- 22 -

Ticketmaster and false equivalence of features with Spotlight to numerous other customers and prospective customers.

### 11. *Misrepresentations on TicketOS' Website*

117. In addition to its campaign of misrepresentation made in countless sales pitches and requests for proposal, Defendants' website also highlights false and deceptive representations.

118. On Defendants' website, on a page titled *Touchless Fulfillment*, in discussing its corporate ticket management services, Defendants falsely state: "TicketOS integrates with all major mobile ticketing providers." (**Exhibit G**.)



119. The representation that TicketOS integrates with all major mobile ticketing providers is literally false. TicketOS does not have any integration with Ticketmaster for corporate ticket management, the

largest mobile ticketing provider.

120. Customers upon seeing these misrepresentations on Defendants' website would believe that TicketOS is, in fact, integrated with Ticketmaster.

121. Upon information and belief, these representations—made on Defendants' website and in their interactions with potential clients—are false and deceptive.

122. These statements constitute commercial advertising or promotion within the meaning of the Lanham Act.

123. TicketOS does not have Ticketmaster integration for corporate ticket management.

124. Spotlight is the exclusive ticket management platform for Ticketmaster for the business event and corporate ticket management category.

125. Spotlight is also the *only* company that has Ticketmaster integration for the business event and corporate ticket management category.

126. To date, Spotlight has paid millions of dollars in annual fees for that privilege.

127. Defendants *know* that Spotlight is the exclusive ticket management platform for Ticketmaster for the business event and corporate ticket management category.

128. Defendants also know that Spotlight is the only company that has Ticketmaster integration for business events and corporate ticket management.

129. In a public letter dated March 31, 2021, Ticketmaster affirmed that it entered an "**exclusive** partnership" with Spotlight/TicketManager and that Spotlight is the "**only**" Ticketmaster partner "who has integration with Ticketmaster in the event and corporate ticket management market." (**Exhibit H** (emphasis in original).)

130. In that letter, Ticketmaster warns consumers that vendors like TicketOS in the ticket and event management marketplace are "mis-representing … capabilities they have with Ticketmaster" and asks consumers to report any such false claims directly to Ticketmaster. (*Id*.)

131. Upon information and belief, Ticketmaster sent this letter specifically to Defendant TicketOS.

132. Defendants in fact *admitted* they knew about Spotlight's contractual rights. On July 11, 2019, Ari Strulson (an officer and member of all three Defendants) told Ken Hanscom, Spotlight's Chief Operating Officer, that he admired Spotlight's exclusive relationship with Ticketmaster, but that companies were finding ways to get around it.

133. Not only that, but on May 12, 2022, TicketOS' Chief Technology

Officer contacted Ticketmaster's Chief Strategy Officer ("CSO") and asked if TicketOS could obtain an integration with Ticketmaster. In response, Ticketmaster's CSO informed TicketOS that "We currently have an *exclusive partnership* with TicketManager *so an integration won't be possible*," (emphasis added). A copy of the May 12, 2022 email is attached hereto as **Exhibit I**.

134. Undeterred, TicketOS tried to do an end-run around Ticketmaster's CSO by reaching out in November 13, 2022 to Ticketmaster's Chief Product Officer ("CPO") seeking "a partnership with TicketMaster and access to the Nexus Partnership APIs,". The end-run failed as Ticketmaster's CPO forwarded the inquiry to its CSO who already rejected TicketOS and informed them of Spotlight's exclusivity. A copy of the email chain is attached as **Exhibit J**.

135. On September 6, 2024, TicketOS once again reached out to Ticketmaster's CSO about obtaining an integration and expressly acknowledged Spotlight's exclusive integration. *See* **Exhibit I**.

136. Despite repeated communications from Ticketmaster acknowledging Spotlight's exclusive integration and denying TicketOS an integration, TicketOS continued to make misrepresentations to the marketplace that it had an integration with Ticketmaster and that it could do everything

- 26 -

Spotlight could do.

137. TicketOS made such misrepresentations knowing them to be false and misleading.

**G.    TradeDesk API**

138. Upon information and belief, Defendants may claim to have an integration with Ticketmaster by virtue of using certain Ticketmaster tools.

139. While certain third parties do work with Ticketmaster on secondary market ticket sales (e.g., resales through StubHub), they are prohibited from operating in the business events and corporate ticket management space.

140. Specifically, Ticketmaster makes a specific suite of API functions available to ticket brokers that are reselling tickets, typically on secondary ticket markets (e.g., Stubhub).  The Ticketmaster API suite (referred to as TradeDesk) enables transfer of such tickets on secondary markets and updating of ownership information.

141. Upon information and belief, the TradeDesk API suite contractually limits the use of the API and does not allow use in a manner that derives revenue from use of the API such as in the field of corporate ticket management.

142. Moreover, the TradeDesk API is more limited in functionality than the exclusive integration that Spotlight has with Ticketmaster. The TradeDesk API only provides certain functions like ticket transfers for brokers. It does not, for example, have features like real-time reporting when scanning tickets at venues or recission of ticket transfers. That type of functionality is exclusive to Spotlight's integration with Ticketmaster.

143. So while using a third party intermediary that utilizes TradeDesk API may provide limited functionality in the context of ticket brokerage services, it does not provide the same functionality as Spotlight's exclusive integration with Ticketmaster.

144. Even more critical, TradeDesk is NOT an integration with Ticketmaster.

145. As testified by Ticketmaster's Senior Vice-President of Product Management Phil Volini,who is in charge of TradeDesk, TradeDesk is a broker tool that was designed to prevent brokers from scraping, crawling, or otherwise burdening Ticketmaster's website servers. It was developed as a front-end method to automate access to the Ticketmaster website.

146. As Mr. Volini explained, TradeDesk is merely an automated access

point to log into the Ticketmaster website (no different in his words than logging into your Macy's account on Macys.com).

147. Mr. Volini further notes that users of TradeDesk do not integrate their systems with Ticketmaster's systems.

148. However, the lack of integration from using TradeDesk likely is moot given that upon information and belief Defendants utilize a third-party intermediary and do not use TradeDesk themselves.

**H.    Third Party Intermediary**

149. Upon information and belief, in an apparent effort to circumvent Spotlight's exclusive contractual arrangement with Ticketmaster, Defendants are utilizing a third-party service to access Ticketmaster and facilitate ticket transactions.

150. However, upon information and belief, TicketOS is not itself using the TradeDesk API.  Rather, upon information and belief, TicketOS uses third party service providers and those third-party service providers may utilize the TradeDesk API with their third party system.

151. But using a third-party intermediary means that TicketOS itself is not integrated with the Ticketmaster system.

152. If TicketOS utilizes a third-party intermediary, then TicketOS's system would not be "working together" or "collaborating" with

- 29 -

Ticketmaster's system.

153. Rather, TicketOS's system would be interacting with the third-party intermediary's system. This could be achieved through an integration of TicketOS' system with the third-party system, or it could be a manual interaction that requires either human intervention or use of some semi-automated process such as by using a bot.

154. Upon information and belief, the third-party intermediary similarly might either talk to Ticketmaster's system through an API (such as the aforementioned TradeDesk API that prohibits corporate ticket management) or by means of a manual process requiring human intervention or use of bots.

155. However, upon information and belief, the third-party intermediary might not even be utilizing the TradeDesk API at all and is instead likely scraping the Ticketmaster website.

156. Ticketmaster charges users of TradeDesk a per ticket fee for every ticket transferred.

157. Upon information and belief, the third party intermediary likely avoids paying such fees by opting to scrape the Ticketmaster website.

158. Even in the scenario where TicketOS is arguably integrated with the third party, and the third party is separately integrated with

Ticketmaster, TicketOS' system would not be talking directly with Ticketmaster.  In that scenario, TicketOS would interact and pass information back and forth with the third-party intermediary.  The third-party intermediary would separately interact with and pass information back and forth with Ticketmaster.

159. Upon information and belief, from a view of TradeDesk's API as well as code of a known third-party that interacts with Ticketmaster, the data being exchanged between TicketOS and the intermediary is not even the same as the data being exchanged between the intermediary and Ticketmaster.  That is, there are two separate transfers of data occurring, with different data, as visualized below:



160. In such a case, Defendants would be relying entirely on the third-party intermediary and would not themselves have access to any functionality of Ticketmaster's systems.

161. Consumers do not perceive such an arrangement to be an integration. In Mr. Franklyn's aforementioned survey, 53.1% of respondents did not believe that integration includes going through a third-party

intermediary such as the method likely used by TicketOS.

162. Such results are consistent with sworn declarations provided by several consumers of corporate ticket management services in another litigation also attesting to the fact that they would not consider going through a third-party intermediary to be an integration. *See* Customer Declarations.

163. And this should not be surprising, given that relying on a third party to interact with Ticketmaster is inherently less reliable than having an integration with Ticketmaster. This is because Defendants would rely entirely on the third party to process the tickets for them. If the third party, outside of Defendants' control, has any issues (such as network connectivity issues, relationship problems with Ticketmaster, etc.), then Defendants would not be able to process the Ticketmaster tickets for their customers. Moreover, by introducing a third party into the equation, Defendants increase the likelihood of connectivity issues resulting in an inability to process Ticketmaster tickets as their system relies on two separate connections, their own with the third party, and the third party's with Ticketmaster (which is outside of their control).

164. In addition, by inappropriately using a tool such as TradeDesk, customers risk channeling their data through a tool not equipped with

the security measures required for corporate ticket management.  Many consumers of these services, such as financial institutions, are subject to regulatory compliance requirements.  By utilizing a third-party intermediary, TicketOS would necessarily be passing personal identifying information to an undisclosed third party.  Using such a tool without the proper safeguards could expose the customers to violations of their own privacy agreements and breach their own security protocols exposing them to violations of various data privacy laws.

165. If Defendants are indeed able to provide their services to their customers for a lower price than Spotlight, which they publicly claim, then it is because they are not integrated with Ticketmaster (avoiding the significant integration fees charged by Ticketmaster), and as such offer an inferior and more unreliable service.

## I.    Ticketmaster Integration Is Material to Consumers' Purchasing Decisions

166. Defendants' false and deceptive advertising statements and claims are about Ticketmaster integration are material in that they influence consumer purchasing decisions.

167. By way of example, the aforementioned survey expert Mr. Franklyn also tested the materiality of having an integration with Ticketmaster for a corporate ticket management service.  64% of respondents stated

that their decision to use a ticket management service would be influenced by whether such service was integrated with Ticketmaster.

168. In addition, several customers testified in another litigation that having a Ticketmaster integration was material to their purchasing decision.

169. Several customers also testified that Spotlight's exclusive features like scan data were essential to their decision making in selecting a corporate ticket management service.

170. Based on Defendants' misrepresentations, customers have and will incorrectly conclude that using TicketOS offers the same exclusive features as Spotlight, including but not limited to, real-time scan data and rescind functionality.

171. Moreover, based on Defendants' misrepresentations, customers have and will incorrectly conclude that TicketOS's service is at least on par with and as reliable as Spotlight's service.

172. As explained by Josh Williams, a former lead software engineer of Concierge Live, the Parties' other principal competitor, a customer "would not necessarily realize the difference" between using Trade Desk and a third party intermediary to impermissibly scrape, crawl, or use bots to pull information from Ticketmaster "because they both look the same from the customer's viewpoint." A copy of Mr. Williams'

sworn declaration is attached as **Exhibit K**.

173. As such, consumers may expect a service advertising an integration would have certain expectations of reliability, security, approval, and compliance that come from having a true integration, but would be deceived and never realize the service lacked an integration until a breakdown occurred.

174. Consumers would be deceived and would not realize the inferiority of the service until breakdowns occur such as what happened with another competitor of Spotlight using an intermediary where some 2,000 Ticketmaster tickets disappeared as a result and another incident where the connection to Ticketmaster through the intermediary was interrupted preventing customers from processing their Ticketmaster sourced tickets.

175. Defendants' false and deceptive advertising statements and claims have a tendency to confuse, mislead and deceive a substantial segment of their audience as to the nature, characteristics, and qualities of their services.

**J.    Damages to Spotlight Caused by TicketOS's Malfeasance**

176. Defendants engaged in a marketing campaign promoting their ticket management services with false representations of integration with

Ticketmaster and/or having break glass security functionality to countless prospective customers through in-person sales pitches.

177. Representatives of Defendants, including Strulson, have repeated the above-described false representations concerning integration and/or break glass functionality with Ticketmaster directly to prospective customers, including clients and potential clients of Spotlight.

178. The full extent of Defendants' interference with Spotlight in the marketplace is presently unknown to Spotlight.

179. Defendants' fraudulent conduct has thus inflicted and continues to inflict irreparable harm upon Spotlight.

180. As a direct result of Defendants' actions, Spotlight has also lost the full benefit of the exclusive integration relationship with Ticketmaster for which Spotlight has paid annual fees and a revenue share totaling millions of dollars.

181. As a direct result of Defendants' actions, Ticketmaster has lost the full benefit of its agreement with Spotlight based on lost commissions from Defendants taking customers based on fraudulent conduct.

182. If left unchecked, Defendants' fraudulent actions will continue to irreparably harm Spotlight and deceive the market and public, including Spotlight's current and potential customers.

183. As a direct result of Defendants' actions, Spotlight has also lost business contracts and dealings with existing and prospective customers.

## COUNT I – FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a)(1)(B)

184. All of the above allegations are hereby incorporated as if fully set forth herein.

185. Defendants' marketing and advertising of their services, which directly compete with Spotlight's services, constitute false and deceptive advertising under the Lanham Act.

186. Defendants have published false information concerning their functionality and purported integration with Ticketmaster as well as security protocols on their public website and made false or intentionally misleading oral and/or written misrepresentations during direct sales pitches.

187. These repeated representations that TicketOS is integrated with Ticketmaster's platform or that they have a contract for integration with Ticketmaster, and that they provides "break glass security" are false, untrue, and misleading, as TicketOS is not integrated with Ticketmaster, nor do they have a contractual right to be integrated with Ticketmaster, and Defendants did not implement the required "break

glass security" called for in the prospective customers' RFP.

188. Spotlight is the exclusive ticket management platform for Ticketmaster for the business event and corporate ticket management category and is the only company that has Ticketmaster integration in this category.

189. TicketOS is not integrated with Ticketmaster's platform for corporate ticket management.

190. Defendants have made, and continue to make, false and deceptive statements and claims about their platform by representing to current and potential consumers—in advertising material on their website— that the TicketOS has integration with Ticketmaster for their corporate ticket management services.

191. Defendants knew or should have known that their advertising claims have not been substantiated and, in any event, are false and deceptive because they do not have integration with Ticketmaster for corporate ticket management and because they were aware of Spotlight's exclusive rights to integration in this space.

192. These statements constitute commercial advertising or promotion within the meaning of the Lanham Act.

193. Defendants' false and deceptive advertising statements and claims have a tendency to confuse, mislead and deceive a substantial segment of its

audience as to the nature, characteristics, and qualities of TicketOS's platform.

194. Defendants' false and deceptive advertising statements and claims are material in that they have influenced and are likely to influence consumer purchasing decisions.

195. Defendants placed these false and deceptive advertising statements and claims in interstate commerce by disseminating these representations nationwide on their website and by making in person pitches to prospective customers across the country.

196. As a direct and proximate result of these deceptive acts, Spotlight has been damaged, and will continue to be damaged, in an amount that will be ascertained according to proof. Spotlight's damages include actual damages in the form of diminished goodwill and lost profits stemming from reduced demand for its services caused by Defendants' false and deceptive advertising; the disgorgement of any profits that Defendants unfairly realized, retained or gained through their unlawful conduct in the course of their false and deceptive marketing campaigns; and the costs of this action.

197. Although the full extent of Spotlight's injuries due to Defendants' conduct is presently unknown, Spotlight as described above has lost

business to Defendants due to the latter's false representations during pitches and RFP processes involving Spotlight. Even when Spotlight has won certain customer's business, it has been for a reduced price due to Defendants' misrepresentations. Spotlight is also currently engaged in ongoing pitches and in RFP processes involving TicketOS where Defendants' misrepresentations are actively causing harm to Spotlight. Spotlight would not have lost the business of these entities, or been forced to sell their services for a reduced price, had it not been for Defendants' unlawful, unfair, and fraudulent conduct.

198. Spotlight will continue to suffer injury to its business associated with the sale of its competing services unless and until Defendants' and any others in active concert with Defendants are enjoined from continuing their wrongful acts, as described herein.

199. Based on the foregoing, Defendants have engaged in false and deceptive advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

200. On information and belief, Defendants have engaged in this activity knowingly, willfully, and in bad faith, justifying the assessment of enhanced damages against them. Defendants know that Spotlight is the exclusive ticket management platform for Ticketmaster for the business event and corporate ticket management category and is the only

company that has Ticketmaster integration.

201. Defendants' acts make this an exceptional case under 15 U.S.C. § 1117(a), and Spotlight is thus entitled to an award of its attorneys' fees and costs.

## COUNT II – INTENTIONAL INTERFERENCE WITH A CONTRACT

202. All of the above allegations are hereby incorporated as if fully set forth herein.

203. Defendants intentionally interfered with a contract between Spotlight and Ticketmaster.

204. Because of Defendants' misrepresentations about their integration with Ticketmaster to current and prospective customers of Spotlight, they diverted business away from Spotlight, which hindered Spotlight's ability to fully benefit from its exclusive contract with Ticketmaster.

205. Defendants' misrepresentations and actions interfered with the exclusive benefit of Spotlight's contract with Ticketmaster.

206. As described above, Defendants had knowledge of the existence of the exclusive contractual relationship with Ticketmaster, but took intentional acts designed to disrupt and interfere with this relationship.

207. Since at least 2019, Defendants have publicly and falsely represented and advertised through their public website, marketing materials, and

direct communications with potential clients that TicketOS has the same integration with Ticketmaster as Spotlight, that TicketOS has the same functionality as Spotlight, and that Spotlight's relationship with Ticketmaster is merely a marketing agreement.

208. Representatives of Defendants, including Sturlson, have repeated these above-described false representations directly to existing and prospective customers, including in connection with pitches and RFP processes involving customers and potential customers of Spotlight.

209. These representations are fraudulent and false. TicketOS does not have Ticketmaster integration. Spotlight is the exclusive ticket management platform for Ticketmaster for the business event and corporate ticket management category and is the only company that has Ticketmaster integration.

210. Defendants know that what they are doing is wrong. Defendants know that Spotlight is the exclusive ticket management platform for Ticketmaster for the business event and corporate ticket management category and is the only company that has Ticketmaster integration.

211. Defendants' acts have disrupted Spotlight's above-described contracts. As a direct result of Defendants' actions, and as described above, Spotlight has lost business to Defendants due to the latter's false

representations during pitches and RFP processes involving Spotlight's customers.

212. In addition to lost sales and revenue, these misrepresentations cause Spotlight to suffer lost goodwill and harm to its reputation.

213. Defendants' conduct substantially caused this harm.

214. The aforementioned conduct of Defendants was willful, oppressive, malicious, and/or fraudulent, thereby also justifying an award of punitive damages.

### COUNT III – INTENTIONAL INTERFERENCE WITH PROSEPECTIVE ECONOMIC ADVANTAGE

215. All of the above allegations are hereby incorporated as if fully set forth herein.

216. Defendants intentionally interfered with a prospective business opportunity of Spotlight because Defendants misrepresented their capabilities to a global financial services firm, which resulted in Spotlight losing the business opportunity to Defendants.

217. Defendants also intentionally interfered with a prospective opportunity between Spotlight and a paper products manufacturer. Specifically, Spotlight had an existing contractual relationship with the paper products manufacturer.

218. Upon information and belief, Defendants were aware of Spotlight's

contract with the paper products manufacturer and induced said customer to not renew their contract with Spotlight.

219. Defendants misrepresented their capabilities to the paper products manufacturer, including having a "break glass" security protocol and integration with Ticketmaster, neither of which was true.

220. As a result of Defendants' misrepresentations, they induced the paper products manufacturer to not renew its contract with Spotlight and moved its business to Defendants.

221. As described above, economic relationships existed between Spotlight and certain potential customers which had or have a probability of supplying economic benefits to Spotlight in the future.

222. Defendants had knowledge of the existence of these relationships.

223. Defendants took intentional acts designed to disrupt and interfere with these relationships.

224. Since at least 2019, Defendants have publicly and falsely represented and advertised through their public website, marketing materials, and direct communications with potential clients that TicketOS has the same integration with Ticketmaster as Spotlight, that TicketOS has the same functionality as Spotlight, and that Spotlight's relationship with Ticketmaster is merely a marketing agreement.

225. Representatives of Defendants, including Sturlson, have repeated these above-described false representations directly to existing and prospective customers, including in connection with pitches and RFP processes involving Spotlight.

226. These representations are fraudulent and false. TicketOS does not have Ticketmaster integration. Spotlight is the exclusive ticket management platform for Ticketmaster for the business event and corporate ticket management category and is the only company that has Ticketmaster integration.

227. Defendants know that what they are doing is wrong. Defendants know that Spotlight is the exclusive ticket management platform for Ticketmaster for the business event and corporate ticket management category and is the only company that has Ticketmaster integration. Defendants have acted with malice in that they engaged in a pattern of false advertising and making false representations in an effort to interfere with Spotlight's prospective business opportunity.

228. Defendants' acts have disrupted Spotlight's above-described economic relationships. As a direct result of Defendants' actions, and as described above, Spotlight has lost business to Defendants due to the latter's false representations during pitches and RFP processes

involving Spotlight's potential customers. Spotlight is also currently engaged in ongoing pitches and in RFP processes involving TicketOS where Defendants' misrepresentations are actively causing harm to Spotlight.

229. In addition to lost sales and revenue, these misrepresentations cause Spotlight to suffer lost goodwill and harm to its reputation.

230. Defendants' conduct substantially caused this harm.

231. The aforementioned conduct of Defendants was willful, oppressive, malicious, and/or fraudulent, thereby also justifying an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Spotlight requests judgment against Defendants as follows:

A.     Issue a preliminary and permanent injunction enjoining Defendants from representing that TicketOS has integration with Ticketmaster's platform;

B.     Issue a preliminary and permanent injunction enjoining Defendants from any further violations of the Lanham Act;

C.     Issue a preliminary and permanent injunction ordering Defendants to remove from their website and any marketing materials any representations that TicketOS has integration with Ticketmaster's platform;

D.    Award Spotlight damages in an amount to be determined at trial;

E.    Award Spotlight punitive, special, and/or exemplary damages in an amount to be determined at trial;

F.    Order disgorgement of Defendants' profits;

G.    Award Spotlight its costs, attorneys' fees, and pre- and post-judgment interest; and

H.    Award to Spotlight any other relief that is just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

\*          \*          \*

**MORGAN, LEWIS & BOCKIUS LLP**

Counsel for Plaintiff

DATED: April 10, 2026

By:   */s/ Torsten M. Kracht*
Torsten M. Kracht (Atty. ID # 3241998)
torsten.kracht@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Telephone:  (202) 739-5346
Facsimile:  (202) 739-3001

Christopher M. Pardo, Esq.
(*Pro Hac Vice*)
christopher.pardo@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, Massachusetts 02110
Telephone:  (617) 341-7700
Facsimile:  (617) 341-7701

*Attorneys for Plaintiff*
*Spotlight Ticket Management, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Torsten M. Kracht, do hereby certify that on April 10, 2026, I caused a

true and correct copy of the foregoing Second Amended Complaint to be served

via the Court's Electronic Case Filing System on all counsel of record.


<u>*/s/ Torsten M. Kracht*</u>
Torsten M. Kracht