# EXHIBIT A

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

SPOTLIGHT TICKET MANAGEMENT,

                                    CIVIL ACTION NUMBER:

         Plaintiff,

vs.                                 2:25-cv-00170-MCA-JSA

TICKETOS, TICKETOS TECHNOLOGY, INC.,      ORAL ARGUMENT
and NEXT SPORTS & ENTERTAINMENT,

                                    VIA VIDEOCONFERENCE

         Defendants.
_____

MARTIN LUTHER KING BUILDING & U.S. COURTHOUSE
50 Walnut Street
Newark, New Jersey  07101
February 25, 2026
Commencing at 3:04 p.m.

**B E F O R E:       THE HONORABLE MADELINE COX ARLEO,
                    UNITED STATES DISTRICT JUDGE**

A P P E A R A N C E S:

HUNTON ANDREWS KURTH, LLP
BY: TORSTEN MICHAEL KRACHT, ESQUIRE
    CHRISTOPHER PARDO, ESQUIRE, Pro Hac Vice
2200 Pennsylvania Avenue, NW
Washington, DC 20037
For the Plaintiff

ARCHER & GREINER, PC
BY:  PATRICK PAPALIA, ESQUIRE
     CHRISTIAN A. STUEBEN, ESQUIRE
Court Plaza South, West Wing
21 Main Street, Suite 353
Hackensack, New Jersey 07601
For the Defendant

**A L S O   P R E S E N T**
ARI STRULSON, CEO of TicketOS

              Diane DiTizii, Official Court Reporter
                       973-776-7738
              diane_ditizii@njd.uscourts.gov
Proceedings recorded by mechanical stenography; transcript
         produced by computer-aided transcription.

(PROCEEDINGS held via videoconference before the Honorable Madeline Cox Arleo, United States District Court Judge, at 3:04 p.m.)

COURTROOM DEPUTY: This is Judge Arleo. We're here for oral argument.

Can I have appearances, please?

MR. KRACHT: Good afternoon, your Honor. Torsten Kracht from Hunton Andrews Kurth on behalf of plaintiff Spotlight, and with me is my colleague Chris Pardo.

THE COURT: Okay.

MR. PAPALIA: Good afternoon, your Honor. Patrick Papalia from Archer & Greiner. Here with me in my office is my partner Christian Stueben. Also with me is Ari Strulson, CEO of TicketOS.

We represent the TicketOS defendants.

THE COURT: Thank you.

All right. I have to ask Mr. Pardo -- I guess I should ask Mr. Kracht, where are you because I don't see snow in your background?

MR. KRACHT: I'm in D.C. We didn't get any.

THE COURT: Okay. Just checking. I was going to be angry at you if you told me you were in San Diego.

MR. PARDO: Your Honor, if you'd like me to carry my computer outside, I'm in Boston. I can stand in a chest-deep snowbank for you.

THE COURT:  That makes me feel better.  Okay.  We're all good.

Mr. Papalia, where are you practicing?

MR. PAPALIA:  Judge, I'm in Hackensack and there's a lot of snow.

THE COURT:  Hackensack.  Do you know one of my -- probably my favorite bankruptcy judge in the whole world, I used to practice law with him a long time ago, Vincent Papalia?

MR. PAPALIA:  I do, Judge, yes.

THE COURT:  Any relation?

MR. PAPALIA:  Distant cousin.

THE COURT:  Oh, wow.  He says Papalia, you say Papalia [pronunciation].

MR. PAPALIA:  I say Papalia.  I make fun of him that he's one generation before me here so he lost the proper pronunciation.

THE COURT:  That happens.  It happens all the time.

All right, gentlemen.  Thank you for participating by Zoom today.

Before me is defendant's motion to dismiss.  I got briefing from both sides, and then I got a flurry of last-minute submissions seeking for the Court to consider additional facts.  I want to talk about that to begin with and then I have some questions I want to ask both sides.

So I spent a lot of time trying to understand the

United States District Court
District of New Jersey

whole Ticketmaster third-party ticket Spotlight and how all those services sort of interact as given to me in the amended complaint. So I'm going to start at the end and I'm going to say my inclination is to allow plaintiff, Spotlight, to file an amended complaint and incorporate some of those new allegations, which may or may not go to the intent of the defendant in terms of intent to deceive or knowledge. It may bear on the common law claims, it may bear on intent to deceive if there was a finding at the end of the day that some of the statements were ambiguous.

So no matter what I did, if I had not received those supplemental letters, I would probably be inclined to let you amend anyway because there are some issues in the way your complaint is drafted that left me a little bit unsure about what you were alleging.

So I'm going to say that, with this caveat, I know there's an ongoing lawsuit in another jurisdiction, and I know you're probably getting some facts from that lawsuit, if there's going to be another amended complaint -- this would be your second amended complaint -- no more letters, no more new facts until -- make every effort to put everything in, bearing in mind that I'm probably inclined to let you move forward at this juncture. Because if we keep sending letters in the middle of motions, it's really disruptive to the process. It's not the best way to proceed.

So if something very important comes up, a leave to appeal is granted in the interest of justice, but if it just becomes a snowball of new facts and new allegations throughout the litigation, you can address those in discovery and they can be raised after discovery is completed in a summary judgment motion, but for a motion to dismiss I just want to make sure I understand what you're alleging, and there is some ambiguity here.  I'm going to have this conversation with you so that your amended complaint will address it more fully.  A lot of it are issues that have been raised by the defendant in their moving papers and in their reply brief.

So let me begin by the big question in the room which is integration and how it's defined.  I will tell you I don't find it persuasive that you might have defined it differently in another lawsuit in another place.  It's about here and it's about -- I'm not even sure your definition carries the day.  It's about what the misrepresentations are.

So in one paragraph, I think it's 25, I understand from reading your complaint really carefully and reading the briefs really carefully, that you define -- in this case you define it as, you say:  Simply stated, integration in the context of computer systems refers to the process of connecting and enabling different systems and applications to talk directly to one another to work together seamlessly.

So direct communication, we have a special

relationship with Spotlight, spotlight has one with Ticketmaster.  They can basically be in this lay on -- stand on top of Ticketmaster, as you describe it, and directly be integrated with their system.

But you also talk about functionality.  You talk about functionality in a couple of different ways.  You talk about, well, we have this special, unique relationship with Ticketmaster that we pay a premium for that gives us realtime data, that also gives us like less -- less of a chance of connectivity problems, because we are sitting on top of them, we are directly connecting with them.

So I guess my question to plaintiff's counsel is -- this will guide the discovery process because they'll be in your pleading -- when you say we're functioning, is functionality just a separate contractual benefit or is it inherent in, like, the functionality realtime data, or is it inherent in being fully -- fully integrating, meaning being able to directly communicate?

I say this because the way you define the API trade suite is direct communication.  So if it's direct communication, you know, clearly you have -- Spotlight has a different relationship with Ticketmaster, but in terms of integration, if it's we can communicate directly, can TicketOS communicate directly through its third parties, and that's what I want you to talk about and elaborate a little bit on the

functionality piece.

MR. PARDO:  Understood, your Honor, and thank you for having, obviously, read this so carefully.

I'm just a low-league English major so I apologize for my lack of technical knowledge.  Right?

THE COURT:  Welcome to the club.

MR. PARDO:  But what I will say is the bases for the Lanham Act claim -- there's a variety of bases, one of them is the claim that TicketOS has an integration with Ticketmaster which -- and I apologize to the Court for submitting a letter with additional information in evidence, but the reality is in this other litigation, the defendant in that case served a subpoena on Ticketmaster.  Ticketmaster produced a ton of documentation, some of which indicated -- actually established, proved TicketOS, they were told, you don't have an integration with us at all and you can't have one because Spotlight has an exclusive integration.

So TicketOS's representations to the market that they have an integration with Ticketmaster are literal falsities.

THE COURT:  Well, that's your strongest claim and if that's what all this was about, that they're the same as Spotlight, that's probably the strongest piece of your Lanham Act claim.

MR. PARDO:  There's more.

THE COURT:  There's more.  For example -- because

it's all about the statements.  Nothing else.  It's what they've said about this integration as it relates to you.

In the complaint, I will tell you I'm not persuaded by what's in there.  You say that they made misrepresentations, actionable misrepresentations in their website, and you cite that in paragraph 41.  You say:  TicketOS integrates with all major mobile ticketing providers, comma, eliminating the need to log into various ticket accounts to transfer tickets.

So they qualify that definition of integration here, and then the other -- the other aspects on the website, that eliminates the need to log in, you don't have to go and log into a different website like StubHub or something like Vivid Seats to get your tickets.  We're integrated in a sense, and they define what they mean by it.

And what they say afterward is true.  They say -- they define it.  They don't say we're Ticketmaster.  The entry is all major ticketing providers, which a consumer can say, well, there's StubHub, there's Vivid Seats, there's SeatGeek.  There's all these providers eliminating the need to log in.

That's how they define it.  So that's certainly not literally false, and you'd have a hard time convincing me that's even ambiguous because they define it that way.  You can't -- there's a big difference between putting that out there saying we're integrated with all the major ticketing providers and that means that -- that means that it eliminated

the need to log into various accounts.  That's all true.

That's very different than saying we are the same as Spotlight, our integration is the same, and that's where I think it's important for you to explain to what extent it involves functionality.

MR. PARDO:  Understood, and I appreciate that, your Honor.

I will say that we can elaborate and explain more deeply given that Ticketmaster is roughly 75 percent -- between 50 and 75 percent of the ticket market for the corporate event and ticket management space.  So the consumers of these services, the consumers of event and corporate ticket management services are focused on Ticketmaster, which is why in some of the documentation we attached to the letter we provided, Ticketmaster integration is a requirement of certain of these consumers of these services because it is so important.

THE COURT:  Whatever that means.  But remember, this is all for discovery.  I don't -- this is not a summary judgment motion.  This isn't the in limine motions before a trial.  I'm trying to see if you state a claim.

I'm struggling with the ones in the complaint.  I'm struggling with them because it doesn't say Ticketmaster and it qualifies it by saying eliminating the need to log into various ticket accounts.

I'll let you plead it again.  It's unlikely -- I'm not going to strike certain of the representations.  You either state a claim under the Lanham Act or you don't.  This is not persuading me.  This is a weaker claim.

You have two buckets of claims.  You have the website claims where they carefully define what they mean by integration.  Now, you may say that they know that, but they didn't say we're fully integrated with Ticketmaster, and they also don't say we have the same as Spotlight in their website.

That would be a problem, right?  That would be much -- they're two different -- the website allegations, to me, may not pass at the end of the day.

Now, if they're in meetings, pitch meetings where you're already their client and they're saying, well, we're the same as Spotlight, we offer the same, that's a little different.

But at the end of the day, what is Spotlight -- is it just the fact -- you kind of refer to a couple of things.  That break glass technology, is that something that comes with integration?  Is that -- are you claiming that's a misrepresentation that they make that they don't have?  How does that work together with the idea of integration?  Because that's what you're saying is the Lanham Act violation.  They're literally false or ambiguous statement that's false.

And then you have functionality.  Is the consumer

concerned with functionality?  Is functionality this realtime data about who is sitting in the seats?  Is it functionality about, well, we're probably more safe because you don't have to go through -- there's less likely of a connectivity problem because you're only dealing with us.  We're dealing with Ticketmaster, you're dealing with a third party in between.

MR. PARDO:  That's a question.

THE COURT:  Those are the questions that I want to know because I think it's important to define it when you do your amended complaint.

MR. PARDO:  Understood, and I appreciate that, your Honor.

So there's the literal falsity component and then there's the misleading component, which is it requires the consumer to be actually deceived or that there's a tendency to deceive, and there are a variety from the briefing from the opposition -- I'm sorry, from the motion and the reply brief were not addressed and those are additional bases for the Lanham Act claim and they include TicketOS misrepresenting to consumers of these services that they have a contractual right to integrate with Ticketmaster, which we see from the letters with Ticketmaster, the emails, that's not true.  That's paragraphs 39 and 99.

THE COURT:  Let me and you a question.  Is your allegation that TicketOS directly interacts through this Trade

Desk suite or they use third parties?

MR. PARDO: That's a great question, your Honor. We need discovery to understand that.

From what we see --

THE COURT: I'll tell you why it's an important question, because you've alleged that they can't and if it turns out that they can, they're buying the tickets through the API site, it weakens your claim of the way you've defined it which is the process of connecting directly to Ticketmaster.

If Ticketmaster is providing them with a trade suite and they eliminate the API function, they can work directly with Ticketmaster, then how is it an Lanham Act violation?

MR. PARDO: Because it appears, from what we've learned, that they are connecting through a third party that engages in data scraping using bots on Ticketmaster's website, which is a violation of Ticketmaster's terms and conditions and automatically terminates the right and license.

THE COURT: Ticketmaster is not a party here.

MR. PARDO: Correct, but it terminates the license of the user. So they have no right to even engage with Ticketmaster, whether it's directly or through a third party, if they are engaging in that.

THE COURT: But Ticketmaster hasn't declared -- in other words, you're asserting -- they have a relationship with Ticketmaster right now. They have a contractual right to use

the API suite, right?

MR. PARDO:  Unclear, your Honor.  We need discovery to understand that.

THE COURT:  I'm going to let it go forward but this is not -- I have great pause in terms of these collateral claims other than we have the same -- if they're going to pitch we're the same as Ticketmaster -- I mean the same as Spotlight and, obviously, that's a fact issue, you have two examples of it, you said you lost two contracts and one was reported to you in the financial services company after the meeting when you asked why'd you leave us, and the first one you both made a pitch for RFP and both got reported back to you that they said we're the same as Spotlight.

MR. PARDO:  Correct.

THE COURT:  But you have to prove that that was said because the website doesn't say we're the same as Spotlight and the website doesn't say we're directly integrated with Ticketmaster.  And if they're buying the tickets directly from Ticketmaster and not through bots and even if they are through bots, the fact that they integrated with all major ticketing providers who also have a right to have API suite integration, I'm not sure where that goes.  But, you know, these are fact questions that have to be explored in discovery.

Let's talk about functionality.  Is the functionality what you've -- tell me what you think about what functionality

14

means in the context of integration?

MR. PARDO:  To the extent TicketOS is representing that it has the same -- that it can do the same thing that Spotlight does, we know that that is not true because the functionality --

THE COURT:  Wait a minute.  There's a difference between saying -- if they say we can do everything Spotlight does is different than saying we're fully integrated like Spotlight.

MR. PARDO:  Right.

THE COURT:  It really depends.  If they're fully integrated and they're integrated, maybe, you know, they're not fully integrated like Spotlight, they don't have that relationship, but to what extent is functionality part of what integration means?

MR. PARDO:  So the integrations -- let me just take a step back.

The way that I've seen this play out is these ticket broker companies that are essentially masquerading as corporate ticket management companies, like they're using --

THE COURT:  Like SeatGeek?

MR. PARDO:  No, no, no.  There's a company called Concierge Live that we sued in California, that case is slated to go to trial in three months, the slide decks make representations about having --

United States District Court
District of New Jersey

THE COURT:  Do they have authority to use the API Trade Desk?

MR. PARDO:  So we have learned through discovery that they do not use -- they have no direct connection to Ticketmaster.  They're using a third-party ticket broker company that is basically scraping data from Ticketmaster's website, which is not permitted, and making it look like they have an integration and they're telling consumers of these services that they have integration.

THE COURT:  Integration means it gives them the right to use the API suite to buy the tickets directly?

MR. PARDO:  It's not really using an API suite.

So one of the documents we provided with the letter -- and we'll put this into the complaint -- is Ticketmaster is saying using an API is not an integration.  An API is not integration, that's an interface.  Those are two very different things.

Spotlight has special APIs that are actually designed to work in collaboration with Ticketmaster's system that they developed together with Ticketmaster.  That's an integration. Everything else is sort of smoke and mirrors and that's why there's a literal falsity component but also a deception component to this, and that's where when we talk about functionality, to bring it back to your Honor's original question, the functionality is a byproduct of the integration.

So the fact that Spotlight has all of these different functionalities that nobody else has, that's because they developed, in conjunction with Ticketmaster, an integration. The integration consists of a variety of things, including special APIs that allow it to engage in certain functions. The ability to transfer data directly with Ticketmaster, that is data that no one else can transfer, right? That is what is so special about their exclusive integration.

THE COURT: Like what? Give me an example.

MR. PARDO: For example, a great example would be, your Honor, if you're going to a sporting event or a concert, you have Taylor Swift tickets and you can't go at the last minute and you work for one of Spotlight's customers and it's a Ticketmaster event, but you can let Spotlight know and Spotlight can pull the ticket back from you and redistribute it to someone else at the company. Right? Or the company itself could do that and pull the ticket back. Not everyone can do that.

There's also realtime tracking relating to the use of the tickets. So, for example, you're Anheuser-Busch, you have 100,000 tickets because of all of your stadium deals and you're trying to make sure those tickets make it to the appropriate people and are used, they can track those in realtime using Spotlight's integration with Ticketmaster. No one else can do that.

So for the consumers of these services, which are usually big companies that have a lot of tickets, when they're talking about an integration, they're looking for an actual connection between Spotlight and Ticketmaster that gives all of these different services and functionalities that no else has.

What these companies are doing that are claiming to have an integration is they are using a broker tool which was designed by Ticketmaster to prevent scraping of its website, and what it does is it -- it gives you the ability to move a ticket if it works correctly.  But these companies are actually going around it because they don't want to pay Ticketmaster, they're using a third party that scrapes the Ticketmaster website, and then that company called Automatic -- there are a few of them -- only uses the Trade Desk API when they're data scraping fails.

So Spotlight is paying millions of dollars to be on the up-and-up with Ticketmaster.  These companies that they paid for every ticket transfer, you're talking, like, 50 cents a ticket transfer, they would have to pay hundreds of thousands of dollars, if not millions of dollars to Ticketmaster to operate in the way they're doing.

So what they're doing is scraping the website, stealing the data in violation of the terms and conditions, and then claiming to have an integration.  That's what we've learned through discovery in these other cases.

THE COURT:  That's the third party, not TicketOS.

MR. PARDO:  That's the third party.  It's not even TicketOS directly doing it.  Right?  So that's the allegation.

Now, again, we need discovery to see exactly what they're doing and how they're doing it and then how it fits with the terms and conditions.

THE COURT:  Right.

MR. PARDO:  Now Ticketmaster is going to end up being a third-party witness in this case and if that's what's happening here, just like what was happening in California, they sent cease and desist letters to that other company, they were very upset, and that's probably going to happen here as well.  Because, as your Honor saw in our supplemental submission, Ticketmaster is literally saying to TicketOS, you don't have an integration, and they're literally saying -- I mean a C-suite executive at Ticketmaster, Dave Scarborough, the chief strategy officer of the entire company is saying nobody else has an integration with us except Spotlight in the corporate event and ticket management space.

THE COURT:  I hear you.  I'm going to let you replead that and make clear what integration is and how it works with functionality, and I'm inclined to let the case go forward at this juncture, but I'm going to be openminded and see -- I didn't look in detail about everything that you gave me in the supplemental submissions, but I get that you've learned things

in discovery.  But, you know, do it within 30 days.

MR. PARDO:  Yes, your Honor.

THE COURT:  Try to streamline the complaint, give as much detail as possible.

You know, it's unclear what the standard is but, you know, there's a fraud allegation here and I know you gave the customer roughly the dates but anything more -- any more meat on the who, what, where and why of these alleged misrepresentations would be helpful.

MR. PARDO:  Understood, your Honor.

THE COURT:  Anything you would like to add, Mr. Papalia?

MR. PAPALIA:  Your Honor, just a few things, and I understand you're going to let them replead, we're going to move to dismiss again.

And your Honor really hit the bull's eye with the questions that you had.  I've tried to wrap my head around these statements of integration.  I'm not saying from a factual standpoint.  From a legal standpoint, right, because we all agree the standard is literally false statement, which is unambiguous.

This is now going to be the fourth amended complaint of Spotlight.  Fourth.

THE COURT:  Feels like a securities fraud case, but go ahead.

MR. PAPALIA:  Judge, it's really -- it's kind of -- so Mr. Strulson, who's on this, this is a small company based in Montvale, New Jersey.  He's got the same amount of snow that I have and that your Honor has in Newark.  Spotlight is this large company, right -- we've got the David and Goliath battle here -- where they can't compete, they don't want to compete and they can't compete on the business level so they're trying to use the court system.

We are not Concierge Live.  If anyone looks at that complaint, it starts out with that the owners of that company were convicted of criminal fraud for deception.

You know, I find it, you know, interesting but also that Spotlight is trying to throw Concierge Live into this case because they don't have a case against TicketOS.  Okay?  And it's a different case, and when your Honor hit those questions on integration to try to understand it -- because, obviously, if your Honor can't understand it and I don't understand it, that goes to the issue of literal falsity and ambiguity.  And I like to think that when that, as a matter of law, their claim --

THE COURT:  Ambiguity and intent to deceive -- let me just cut you for one minute.  I'll let you finish.

MR. PAPALIA:  Sure.

THE COURT:  This really begs the question to all of them that this is a case you should probably see if you can

resolve.  You're not putting them out of business.  You don't have a lot here.  I'm not impressed by the website stuff, but you have these -- you agree that moving forward that the parameters that can be set at these pitch conferences.

You can't go out and say probably we have the same integration as Spotlight, in light of what I've just heard and what's in the complaint.  Maybe you can.  Maybe it is exactly the same.  Maybe your answer is we never said that.

But this is not a case -- like, he's a little guy and you said he's not as big as the other competitor but, you know, it's the kind of thing where these cases, I can guarantee you from my magistrate judge days, discovery will be expensive, it will be protracted, there'll be multiple motions, there'll be discovery, there'll be summary judgment, there'll be experts, which are very expensive in Lanham Act cases.

So maybe it's something that you should when get to Judge Allen -- it's Judge Allen, right?  Is it Allen or is it -- I'm trying to to see who the magistrate is.

MR. PAPALIA:  I believe so, your Honor.

THE COURT:  Is it Jose Almonte or Jessica Allen?

MR. PARDO:  It's Judge Allen, your Honor.

THE COURT:  Allen.  They both are JAs so I get confused, but Jessica Stein Allen.

Maybe you can talk to Judge Allen and maybe you can see if there's a way to resolve this earlier than later.

MR. PAPALIA: Judge, we're open to that. Unfortunately, I think that Hunton has a client that's trying to use the system to -- for competition. We'll definitely reach out to counsel on that. We appreciate that suggestion.

THE COURT: I do.

MR. PAPALIA: And we agree wholeheartedly with you, but what I was driving at is they're going to amend now a fourth time and if they come up with the same type of allegations, Judge, there's no case here.

I just want to highlight one point.

THE COURT: Let me stop you for one minute.

MR. PAPALIA: Yes.

THE COURT: You're a very good lawyer. You're advocating for your client. It looks like there might be enough to go forward, in my mind from what I've seen so far on those allegations that say we're the same as Spotlight, if that was said.

I don't want to get into a fight about it now because I'm letting them -- I'm trying to give you, like, a roadmap that this case will most likely go forward and it's state law -- common law contractual claims.

Keep an open mind to early resolution, if possible, because a lot of these cases, they take on a life of their own after two years of litigation.

MR. PAPALIA: Judge, you can be rest assured that we

will keep an open mind on it.  We will actually reach out to Judge Allen, Magistrate Judge Allen.

THE COURT:  I'm going to call her next.

MR. PAPALIA:  We'll ask for a conference.  But I just -- the Court needs to be aware that this is not their agenda.  Their agenda is not to settle.  Their agenda is to get beyond this point, which they recognize is a big hurdle otherwise, they wouldn't have amended three times and now I see for a fourth time.

But one point, to just wrap that up, Judge.  This has been going on, according to Spotlight, for five years, from 2021.  Okay.  There's not one customer -- and when we say "customer" -- let me just take a step back.

So this is a ticket management software company, right?  We manage tickets for Fortune 500 companies and other companies throughout the United States.  They have the tickets, they have, whatever, 100 tickets, whatever it is, and we manage them among their employees, et cetera.  That's what this is. It's not a ticket broker.  It's a ticket management business.

They don't have a single allegation that says that one customer was deceived and came back and said, wait a minute, I changed from Spotlight, I went to TicketOS, when I got there I realized that they deceived me, I don't have the same service level, I don't have all these things that I thought, quote, integration means, which again, it can mean

24

anything.

That doesn't exist in five years. What you see in their complaint, they use words carefully because they're not going to put their representation on the line like would, could, could be deceived. That doesn't state a claim as a law.

All I'm saying, your Honor is, fine, let me replead. I know your Honor said --

THE COURT: Let me say one thing back to you. That's your good advocacy piece.

If I find it's literally false for them to say we have the same integration as Spotlight, that's actionable. Where it goes from there, whether they have damages -- you know, it's not a defense if you make literally false statements to say well, you know, they didn't know any better, they didn't leave them, they didn't go back to Spotlight, that may get damages but it doesn't affect whether they state a claim. They state a claim, number one.

Number 2, practice tip. We're on a Zoom right now, to say they're not interested in settlement really just puts everyone's back up. You have to go into settle conferences with an open mind and you have to be realistic and you have to be practical, and that's the best way to represent both of your clients.

If I get a report or I get a sense that one side is being unreasonable, I will not be happy. This case is not

worth a ton of money right now.  There's two clients that you can point to that you've lost because of these alleged misrepresentations.  So, you know, be reasonable.  Your client wants to protect its value as the exclusive integrated company with Ticketmaster.  You know, part of it is how they behave going forward and what kind of representations they make.  So I leave you with that thought.

I'm going to give you 30 days is enough to replead, Mr. Pardo?

MR. PARDO:  If we could have 45, your Honor.

THE COURT:  Sure.  No problem.

MR. PARDO:  We may do it earlier.  I'd just like to get the transcript from today as well to make sure that we're tracking your...

THE COURT:  Did you give me a proposed order?  Mr. Papalia, did you give me a proposed order?

We'll mark up your order.  We'll give you 30 days and you take whatever time you need to respond.

In the meantime, I'm going to call Judge Allen and say to have you guys in ASAP.

MR. PAPALIA:  Your Honor, we appreciate that.

THE COURT:  All right.  Have a nice winter.  I'll see you in the spring.

MR. PARDO:  Thank you, your Honor.

(Time noted: 3:37 p.m.)

United States District Court
District of New Jersey

-------------------------------------------------

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/S/Diane DiTizii, CCR, CRR, RMR, RDR          02/02/2026

Federal Official Court Reporter                    Date

United States District Court
District of New Jersey